IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

LeadingAge Minnesota and Care Providers of Minnesota,

Plaintiffs-Appellants,

vs.

Nicole Blissenbach, in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
CASE NO. 24-CV-4282-LMP-JFD

**APPELLEE'S BRIEF**

FELHABER LARSON
Grant T. Collins, MN (#390654)
Brandon J. Wheeler, MN (#396336)
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: (612) 339-6321
gcollins@felhaber.com
bwheeler@felhaber.com

*Attorneys for Plaintiffs-Appellants*

KEITH ELLISON
Attorney General
State of Minnesota

SCOTT A. GROSSKREUTZ
(#0392714)
LINNEA VANPILSUM-BLOOM
(#0403783)
Assistant Attorneys General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
scott.grosskreutz@ag.state.mn.us
linnea.vanpilsum-bloom@ag.state.mn.us
Phone: (651) 757-1402

*Attorneys for Defendant-Appellee*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

In 2024, Minnesota's Nursing Home Workforce Standards Board promulgated rules establishing minimum nursing home employment standards to protect the health and welfare of nursing home workers. The rules established, in part, holiday pay for nursing home workers on eleven designated holidays and provided employers with the option of shifting the holiday schedule if agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.

LeadingAge Minnesota and Care Providers of Minnesota (collectively referred to herein as "LeadingAge"), nursing home employer representatives, subsequently sued Nicole Blissenbach, in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry ("Commissioner"), alleging that the rules are preempted by the National Labor Relations Act ("NLRA"). The district court[1] granted the Commissioner's motion to dismiss, holding that the rules are not, as a matter of law, preempted by the NLRA.

The Commissioner agrees with LeadingAge that oral argument would help the Court and that twenty minutes suffices.

---

[1] The Honorable Laura M. Provinzino, United States District Judge for the District of Minnesota.

# TABLE OF CONTENTS

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ......................................................................iv

STATEMENT OF THE ISSUE..................................................................1

STATEMENT OF THE CASE...................................................................2

SUMMARY OF ARGUMENT ..................................................................6

ARGUMENT .............................................................................................7

I.     STANDARD OF REVIEW ................................................................7

II.    THE HOLIDAY PAY RULE IS NOT PREEMPTED BY THE NLRA.........................8

    A.    The Holiday Pay Rule Is Not Preempted Under *Machinists* Because It Is A Minimum Labor Standard. .........................................9

        1.    The holiday pay rule does not shift the balance of bargaining power....................................................................13

        2.    The holiday pay rule does not micro-manage the nursing home industry.................................................................16

        3.    A private right of action is an ordinary remedy for violations of a minimum labor standard. ................................18

        4.    The holiday pay rule is not multi-employer bargaining ...........20

    B.    The Date Flexibility Provision Is Not Preempted Under *Garmon* Because It Does Not Create A Labor Organization Or Direct Employers to Dominate Or Assist Labor Organizations. ...................21

        1.    The date flexibility provision does not authorize employers to violate section 8(a)(2). .....................................23

            i.    The date flexibility provision does not create a labor organization as defined under the NLRA.......................23

ii. The date flexibility provision does not direct employers to unlawfully dominate or assist a labor organization. ...............................................29

2. The date flexibility provision does not authorize any violation of Section 7. .............................................36

3. LeadingAge's interpretation of "Arguably" is misplaced. .......39

CONCLUSION ...............................................................................433

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*520 S. Michigan Ave. Assocs., Ltd. v. Shannon*,
549 F.3d 1119 (7th Cir. 2008)..................................................... 9 ,16, 17, 18, 20

*Am. Hotel & Lodging Ass'n v. City of L.A.*,
834 F.3d 958 (9th Cir. 2016)................................................................... 17, 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................... 42

*Associated Builders & Contractors of S. Cal., Inc. v. Nunn*,
356 F.3d 979 (9th Cir. 2004)......................................................................... 17

*Barrentine v. Arkansas-Best Freight Sys., Inc.*,
450 U.S. 728 (1981) ....................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... 41

*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders &*
*Contractors of Mass./R. I., Inc.*,
507 U.S. 218 (1993) ......................................................................................... 6

*Bogan v. Gen. Motors Corp.*,
500 F.3d 828 (8th Cir. 2007)........................................................................... 7

*Brunckhorst v. City of Oak Park Heights*,
914 F.3d 1177 (8th Cir. 2019)................................................................. 28, 30

*Chamber of Commerce v. Bragdon*,
64 F.3d 497 (9th Cir. 1995)............................................................ 14, 16, 17, 20

*Chamber of Commerce v. Brown*,
554 U.S. 60 (2008) ................................................................................... 19, 20

*Chicago Rawhide Manufacturing Co. v. N.L.R.B.*,
221 F.2d 165 (7th Cir. 1955)................................................................... 30, 31

*Concerned Home Care Providers, Inc. v. Cuomo*,
783 F.3d 77 (2d Cir. 2015)..................................................................... 20, 21

*Coppus Engineering Corp. v. N.L.R.B.*,
240 F.2d 564 (1st Cir. 1957) ...................................................................... 30

*Dillingham Const. N.A., Inc. v. Cnty. of Sonoma*,
190 F.3d 1034 (9th Cir. 1999)..................................................................... 12

*Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*,
516 F.3d 695 (8th Cir.2008).......................................................................... 8

*Federal-Mogul Corp. v. N.L.R.B.*,
394 F.2d 915 (6th Cir. 1968)....................................................................... 29

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987) ...................................................................... 1, 10, 12, 13

*Healthcare Ass'n of N.Y. State v. Pataki*,
471 F.3d 87 (2d Cir. 2006)..................................................................... 22, 37

*Idaho Bldg. & Const. Trades Council, AFL-CIO v. Inland Pac. Chapter of
Associated Builders & Contractors, Inc.*,
801 F.3d 950 (9th Cir. 2015)....................................................................... 40

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*,
476 U.S. 380 (1986)............................................................................... 22, 39

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Relations
Comm'n*,
427 U.S. 132 (1976) .............................................................................Passim

*Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985) ................................................................... 1, 10, 11, 20

*Midwest Disability Initiative v. JANS Enters., Inc.*,
929 F.3d 603 (8th Cir. 2019).............................................................. 8, 38, 42

*Nat'l Ass'n of Manufacturers v. Perez*,
103 F. Supp. 3d 7 (D.D.C. 2015) ................................................................ 22

*N.L.R.B. v. Brown Co.*,
160 F.2d 449 (1st Cir. 1947) ....................................................... 31

*N.L.R.B. v. Cabot Carbon Co.*,
360 U.S. 203 (1959) ..................................................................... 24

*N.L.R.B. v. Clapper's Mfg., Inc.*,
458 F.2d 414 (3d Cir. 1972)......................................................... 33

*N.L.R.B. v. Homemaker Shops, Inc.*,
724 F.2d 535 (6th Cir. 1984)........................................... 1, 29, 31

*N.L.R.B. v. Keller Ladders Southern, Inc.*,
405 F.2d 663 (5th Cir. 1968)....................................................... 29

*N.L.R.B. v. Sharples Chemicals, Inc.*,
209 F.2d 645 (6th Cir. 1954)....................................................... 30

*N.Y. Tel. Co. v. N.Y. State Dep't of Labor*,
440 U.S. 519 (1979) ..................................................................... 10

*Rest. L. Ctr. v. City of New York*,
360 F. Supp. 3d 192 (S.D.N.Y. 2019)...................................... 1, 24

*Rest. L. Ctr. v. City of New York*,
90 F.4th 101 (2d Cir. 2024)............................................ 17, 19, 20

*Rhode Island Hosp. Ass'n v. City of Providence ex rel. Lombardi*,
667 F.3d 17 (1st Cir. 2011) ..................................................... 39, 40

*San Diego Bldg. Trades Council Millmen's Union, Local 2020 v. Garmon*,
359 U.S. 236 (1959) .............................................................Passim

*St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*,
218 F.3d 232 (3d Cir. 2000)......................................................... 38

*Thunderbird Mining Co. v. Ventura*,
138 F. Supp. 2d 1193 (D. Minn. 2001).................... 10, 13, 14, 15, 16, 20

*Vencare Ancillary Servs., Inc. v. N.L.R.B.*,
352 F.3d 318 (6th Cir. 2003)....................................................... 24

*Viceroy Gold Corp. v. Aubry*,
  75 F.3d 482 (9th Cir. 1996) ............................................................... 37

*Wayside Press v. N.L.R.B.*,
  206 F.2d 862 (9th Cir. 1953) ............................................................. 31

*Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
  475 U.S. 282 (1986) ........................................................................... 21

**Federal Statutes**

29 U.S.C. § 151 ...................................................................................... 2, 32

29 U.S.C. § 152 .................................................................................... 23, 38

29 U.S.C. § 157 .................................................................................... 3, 36

29 U.S.C. § 158 ............................................................................... 3, 19, 23

**State Statutes**

Minn. Stat. § 14.389 .................................................................................. 4

Minn. Stat. § 177.27, subd. 8 ................................................................. 18

Minn. Stat. § 181.211, subd. 9 ............................................................... 16

Minn. Stat. § 181.212, subd. 1 ................................................................. 3

Minn. Stat. § 181.213, subd. 1 ........................................................... 3, 4, 5

Minn. Stat. § 181.214 ................................................................................ 5

**State Regulations**

Minn. R. 5200.2010, subp. 1 ..................................................................... 5

Minn. R. 5200.2000–.2050 ....................................................................... 4

Minn. R. 5200.2020–.2050 ....................................................................... 5

## Administrative and Executive Materials

*Ampex Corp.*,
  168 NLRB 742 (N.L.R.B. 1967)................................................................... 27

*Clapper's Mfg., Inc.*,
  186 NLRB 324 (N.L.R.B. 1970)................................................................... 34

*Duquesne Univ. of the Holy Ghost*,
  198 NLRB 891 (N.L.R.B. 1972)................................................................... 33

*E.I. du Pont de Nemours & Co.*,
  311 NLRB 893 (N.L.R.B. 1993)............................................................. 24, 25

*Goody's Family Clothing*,
  *993 WL 726790 (N.L.R.B.G.C. Sept. 21, 1993)* ............................... 35, 41

*Han-Dee Spring & Mfg. Co., Inc.*,
  132 NLRB 1542 (N.L.R.B. 1961)................................................................. 34

*Keeler Brass Auto. Group*,
  317 NLRB 1110 (N.L.R.B. 1995)................................................................. 32

*Ona Corp.*,
  285 NLRB 400 (N.L.R.B. 1987)................................................................... 26

*St. Vincent's Hosp.*,
  244 NLRB 84 (N.L.R.B. 1979)..................................................................... 26

*Vencare Ancillary Servs., Inc.*,
  334 NLRB 965 (N.L.R.B. 2001)............................................................. 24, 25

*Vons Grocery Co.*,
  320 NLRB 53 (N.L.R.B. 1995)............................................................... 24, 25

*Wahlgren Magnetics*,
  132 NLRB 1613 (N.L.R.B. 1961)................................................................. 33

**Other Authorities**

N.Y.C. Code § 20-1273(a) ................................................................. 19

*The Roberts Court and the Unraveling of Labor Law,*
  108 Minn. L. Rev. 1407 (2024) .......................................................... 2

# STATEMENT OF THE ISSUE

I.    Whether the district court correctly concluded that the holiday pay rule is not preempted by the NLRA as a matter of law.

*The district court held that the holiday pay rule is not preempted by the NLRA as a matter of law. The district court concluded that the rule does not require or sanction employers to violate the NLRA and does not regulate conduct that the NLRA intended to be left unregulated. As such, the district court concluded that LeadingAge failed to allege a cognizable legal theory and dismissed their amended complaint without prejudice.*

**<u>Most apposite authorities</u>**:

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749 (1985)

*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 22 (1987)

*Rest. L. Ctr. v. City of New York*, 360 F. Supp. 3d 192, 225-26 (S.D.N.Y. 2019)

*N.L.R.B. v. Homemaker Shops, Inc.*, 724 F.2d 535, 545 (6th Cir. 1984)

**STATEMENT OF THE CASE**

*The National Labor Relations Act*

After years of political and legal opposition to workers' attempts to collectively bargain, the Great Depression and a time of significant labor conflict led to the enactment of the NLRA. Courtlyn G. Roser-Jones, *The Roberts Court and the Unraveling of Labor Law*, 108 MINN. L. REV. 1407, 1421-22 (2024). Congress clearly set out the purpose of the NLRA in its preamble, explaining that the legislation addresses the "inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers" who have the benefit of corporate organization. 29 U.S.C. § 151. Ultimately, the goal of the NLRA was to ensure "the free flow of commerce" by "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." *Id.*

Section 7 of the NLRA establishes employees' rights to self-organize, stating:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a

condition of employment as authorized in section 8(a)(3) [section 158(a)(3) of this title].

29 U.S.C. § 157.

Section 8 of the NLRA protects these rights by proscribing employer conduct. Specifically, Section 8 prohibits employers from interfering with these rights by "dominat[ing] or interfere[ing] with the formation or administration of any labor organization or contribut[ing] financial or other support to it." 29 U.S.C. § 158. Although the NLRA does not contain an express preemption provision, these sections provided the basis for subsequent preemption doctrines.

***Minnesota Nursing Home Workforce Standards Board***

The Minnesota Legislature established the Minnesota Nursing Home Workforce Standards Board ("Board") in 2023 and authorized it to establish minimum nursing home employment standards. Minn. Stat. § 181.213, subd. 1. Specifically, "[t]he [B]oard must adopt rules establishing minimum nursing home employment standards that are reasonably necessary and appropriate to protect the health and welfare of nursing home workers." *Id.* The Board is comprised of nine members: three members representing nursing home employers or organizations, three members representing nursing home workers or worker organizations, and the commissioners (or their designees) of the Minnesota Department of Labor and Industry, the Minnesota Department of Human Services, and the Minnesota Department of Health. Minn. Stat. § 181.212, subd. 1.

*Minnesota Rules Parts 5200.2000–.2050*

In carrying out its duty, the Board established Minnesota Rules Part 5200.2000–.2050 ("Rules"), with an effective date of January 1, 2025, under an expedited rulemaking process. *See* Minn. Stat. § 181.213, subd. 1 (authorizing the Board to adopt rules via an expedited process under Minnesota Statutes section 14.389). Rule 5200.2010 states:

> **Subpart 1. Holiday pay.** Beginning January 1, 2025, a nursing home worker who works any holiday shall be paid a minimum of time-and-one-half their regular hourly wage for all hours worked during the holiday.

> **Subp. 2. Modification of holiday date and time**.
> A. The start and stop times for the 24-hour period comprising a holiday can be modified by a nursing home employer if agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.
> B. A nursing home employer may substitute up to four holidays for an alternate day in the same calendar year if the substitution is agreed upon by a majority of affected nursing home workers or the exclusive representative of the affected nursing home workers if one exists.
> C. Any agreement to modify a holiday date or time must be made in the calendar year preceding the start of the calendar year in which the modified holiday is observed. There must be written record of an agreement under this item.
> D. The nursing home employer must retain a record of agreement to modify a holiday date or time under item C for a minimum of three years following the observation of the modified holiday.

Essentially, Rule 5200.2010 ("holiday pay rule") has two separate provisions. First, the holiday pay rule requires nursing home employees to be paid a minimum of time-and-one-half wage of their regular hourly wage for all hours worked during

eleven state holidays ("holiday pay provision"). *See* Minn. R. 5200.2010, subp. 1. Second, the holiday pay rule allows nursing home employers to substitute up to four holidays for an alternate day in the same calendar year and to modify the 24-hour period comprising the holiday so long as the substitution and/or modification is agreed upon by a majority of the nursing home workers or their exclusive representative if one exists ("date flexibility provision"). *Id*., subp. 2.

Nursing home employers are free to determine any process for obtaining approval for schedule modifications, except that the decision to make any changes to the holiday schedule must take place in the preceding calendar year.[2] *Id.* In addition to the holiday pay rule, the Rules established requirements for posting notice of nursing home workers' rights and the process and requirements for worker organizations to become certified under Minnesota Statutes section 181.214. *See* Minn. R. 5200.2020–.2050. The holiday pay rule contributes to the protection of nursing home workers' "health and welfare" by ensuring appropriate compensation for those who work on holidays. Minn. Stat. § 181.213, subd. 1.

---

[2] For example, should an employer wish to modify the start and end time of a holiday in 2026, the modification would need to be in place on December 31, 2025.

*LeadingAge's Challenge to the Rules*

LeadingAge sued the Commissioner[3] alleging that the holiday pay rule was preempted by the NLRA and moved for a preliminary injunction to prevent the enforcement of the holiday pay rule. (App. 1-16, 17-18, R. Doc. 22, 26.) The Commissioner filed a motion to dismiss the amended complaint, arguing that LeadingAge lacked standing and that they failed to state a claim as a matter of law and again opposed LeadingAge's motion for a preliminary injunction. (App. 109-10, 148-89, R. Doc. 36, 41.) The district court granted the Commissioner's motion to dismiss and denied LeadingAge's request for a preliminary injunction as moot. (App. 273-74, R. Doc. 50 at 44-45, Add. 44-45.) This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly dismissed LeadingAge's complaint because their NLRA preemption claim fails as a matter of law. The NLRA preempts States from regulating activity that is reserved to the jurisdiction of the National Labor Relations Board ("NLRB") or the free market. *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 226–27 (1993). To protect against activity reserved for the free market, the United States Supreme Court has found that the NLRA preempts state regulation that governs

---

[3] LeadingAge also initially sued the Nursing Home Workforce Standards Board and the Commissioner but in their amended complaint named only the Commissioner as a Defendant. (App. 1-16, R. Doc. 1, 22.)

conduct that Congress intended to leave unregulated. *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Relations Comm'n*, 427 U.S. 132 (1976) ("*Machinists*"). Additionally, to protect the primary jurisdiction of the NLRB, the Supreme Court has found that the NLRA preempts state regulations that govern conduct that is arguably protected or prohibited by Section 7 or Section 8 of the NLRA. *San Diego Bldg. Trades Council Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959) ("*Garmon*").

Because the holiday pay rule established a minimum labor standard, a practice that is well-established as not preempted by the NLRA, the holiday pay rule is not preempted under *Machinists*. In addition, the date flexibility provision of the holiday pay rule does not create a labor organization under the NLRA, does not dominate or assist any labor organization, and does not interfere with employees' rights to either engage in or refrain from organization and collective bargaining. Accordingly, the holiday pay rule does not govern conduct that is arguably protected or prohibited by Section 7 or Section 8 of the NLRA under *Garmon*.

## ARGUMENT

### I. STANDARD OF REVIEW

Questions of preemption are reviewed de novo. *Bogan v. Gen. Motors Corp.*, 500 F.3d 828, 832 (8th Cir. 2007). Likewise, motions to dismiss for failure to state a claim as a matter of law are reviewed de novo, accepting factual "allegations

contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 698 (8th Cir.2008) (citation omitted). The factual allegations considered are limited to those alleged in the complaint. *Midwest Disability Initiative v. JANS Enters., Inc.,* 929 F.3d 603, 609 (8th Cir. 2019) ("Had the district court considered these declarations, it would have been required to treat the motion to dismiss as one for summary judgment.").

## II. THE HOLIDAY PAY RULE IS NOT PREEMPTED BY THE NLRA.

The holiday pay rule promulgated by the Nursing Home Workforce Standards Board is a minimum labor standard. It does not conflict with the substantive requirements of the NLRA and does not mandate conduct that is arguably protected or prohibited by the NLRA under any doctrine of NLRA preemption.

There are two types of NLRA preemption: *Machinists* preemption and *Garmon* preemption. Under *Machinists*, the NLRA prohibits regulation of activity reserved for the free market. 427 U.S. at 144. Accordingly, the NLRA preempts state regulations that govern conduct which Congress intended to leave unregulated. *Id.* Under *Garmon*, the NLRA preempts state regulations governing conduct that is arguably protected or prohibited by Section 7 or Section 8 of the NLRA. 359 U.S. at 245.

Neither *Garmon* nor *Machinists* preemption applies here. While LeadingAge asserts hypothetical facts and makes conclusory preemption arguments, neither provision of the holiday pay rule is preempted under either theory of preemption.

LeadingAge's arguments fail, in large part, because they rely on conclusory statements that inaptly suggest *any* regulation of working conditions is preempted by the NLRA. However, a "state law is not preempted by the NLRA merely because it regulates a mandatory subject of bargaining." *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1128 (7th Cir. 2008). The question is, rather, whether the provisions identified and challenged by LeadingAge are actually preempted by the established NLRA preemption doctrines. They are not.

First, the holiday pay rule is not preempted under *Machinists*. The holiday pay provision sets forth a minimum labor standard, establishing eleven mandated holidays, and the date flexibility provision does not alter the minimum holiday pay or encourage or discourage the collective bargaining process. Second, the holiday pay rule is not preempted under *Garmon* because the date flexibility provision does not create, or require employers to create, a labor organization and does not require employers to dominate or assist a labor organization.

**A. The Holiday Pay Rule Is Not Preempted Under *Machinists* Because It Is A Minimum Labor Standard.**

The holiday pay rule is a minimum labor standard and therefore is not preempted by the NLRA under *Machinists* as a matter of law. *Machinists*

9

preemption protects against state interference with the policies implicated by the NLRA by preempting state laws regulating conduct that Congress intended to be unregulated. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749 (1985). The NLRA is primarily concerned with establishing an equitable process for determining terms and conditions of employment; not the particular substantive terms of the bargain when parties are negotiating from relatively equal positions. *Id.* at 753. Essentially, *Machinists* preemption protects the collective bargaining process itself from interference. *See Thunderbird Mining Co. v. Ventura*, 138 F. Supp. 2d 1193, 1197 (D. Minn. 2001).

It is well established that states may regulate and set minimum labor standards without intruding upon conduct regulated by the NLRA. *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 22 (1987) (concluding that a state law requiring severance pay for all employees in the event of a plant closing was not preempted by the NLRA); *Metro. Life,* 471 U.S. at 758 (concluding that a state law requiring minimum health benefits for workers was not preempted by the NLRA); *N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519, 545-46 (1979) (concluding that a state unemployment compensation scheme as applied to striking workers was not preempted by the NLRA).

In *Metropolitan Life*, the Supreme Court considered whether a Massachusetts statute requiring minimum mental health care benefits be provided to workers was

preempted under *Machinists* when the insurance policies were purchased pursuant to negotiated collective-bargaining agreements regulated by the NLRA. 471 U.S. at 747–758. The Court observed:

> Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act. Unlike the NLRA, mandated-benefit laws are not laws designed to encourage or discourage employees in the promotion of their interests collectively; rather, they are in part "designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive" the mandated health insurance coverage. [*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)] (emphasis in original). Nor do these laws even inadvertently affect these interests implicated in the NLRA. Rather, they are minimum standards "independent of the collective-bargaining process [that] devolve on [employees] as individual workers, not as members of a collective organization." *Id.* at 745[.]

*Id.* at 755.

The Supreme Court held that the Massachusetts law was not preempted by the NLRA under *Machinists*. *Id*. at 758. In reaching this conclusion, the Court noted that penalizing union employees by exempting them from state labor regulations that guarantee minimum standards for nonunion employees would violate the purpose of the NLRA. *Id*. at 756. The Court recognized that while employers and unions may bargain over wages, hours, working conditions, and pension benefits, nothing in the NLRA expressly forecloses states from regulating these minimum labor standards. *Id*. at 757 (quotation omitted). Nothing in the NLRA's legislative history suggests

that Congress intended to disturb myriad state laws protecting workers—which are a quintessential exercise of state police powers. *Id*. at 756. In this sense, federal labor law supplements state laws where compatible—preempting only those state laws that stymie the NLRA's purposes. *Id*. at 756.

In *Fort Halifax*, the Supreme Court again rejected the argument that a state minimum labor standard implicated *Machinist* preemption by impermissibly intruding upon the collective bargaining process. 482 U.S. at 22. The Court concluded that a state statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing was a "valid and unexceptional exercise of the [State's] police power" and not preempted under the NLRA. *Id.* Similar to the Massachusetts statute at issue in *Metropolitan Life*, the severance pay law in *Fort Halifax* established a minimum labor standard that formed the backdrop for negotiations between employers and employees. *Id*. at 21.

The holiday pay rule is indistinguishable from the non-preempted state minimum labor standards in *Metropolitan Life* and *Fort Halifax*. The holiday pay rule applies to union and nonunion nursing home workers equally. When a state establishes a minimum labor standard that applies to all workers in a sector, both union and non-union, that standard is not preempted by the NLRA under *Machinists*. *Dillingham Const. N.A., Inc. v. Cnty. of Sonoma*, 190 F.3d 1034, 1040 (9th Cir. 1999).

Moreover, the holiday pay rule neither encourages nor discourages the collective bargaining process, as employers and employees covered under the NLRA are free to negotiate higher rates of holiday pay and additional paid holidays. The holiday pay provision simply sets a minimum level of pay for employees working on eleven holidays and the date flexibility provision provides employers with flexibility to accommodate their business models and needs. Whether an employer proposes a modification to the holiday schedule or not, nursing home workers are still being paid the same minimum wage for the same number of holidays.

LeadingAge attempts to distinguish the holiday pay rule from the minimum labor standards in *Metropolitan Life* and *Fort Halifax* by asserting that the statutes in *Metropolitan Life* and *Fort Halifax* applied to all employers in the state. That is incorrect. While the Massachusetts law in *Metropolitan Life* applied to all workers in the state, the severance pay statue in *Fort Halifax* applied only to employers whose employees relocated or were terminated from a facility that employed over 100 or more people and benefited only employees who worked at the facility for more than three years. 482 U.S. at 4, n.1.

### 1. The holiday pay rule does not shift the balance of bargaining power.

LeadingAge argues that the holiday pay provision improperly shifts the balance of employer-employee bargaining power and therefore, is akin to the regulations in *Thunderbird Mining Co. v. Ventura*, 138 F. Supp. 2d 1193 (D.

Minn. 2001), and *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995). This too is incorrect, as the state laws challenged in *Thunderbird* and *Bragdon* were significantly different than the holiday pay rule.

In *Thunderbird,* mining companies argued that a state statute that provided a method for allocating money from a mining development fund was subject to *Machinist* preemption. 138 F. Supp. 2d at 1194–95. The fund allowed mining companies to buy resources for research and development, purely benefiting the companies. *Id.* at 1195. However, the fund could be released to the mining company only after a joint committee of labor and management employees approved the disbursement by a majority vote. *Id.* In union shops, the unions selected the joint committee's employee members. *Id.* The court concluded that the statute provided the unions with a powerful bargaining tool by allowing the committees control over company resources, which implicated *Machinist* preemption. *Id.* at 1198. The union employees on the committee essentially had veto power over the fund allocation. *Id.* This dynamic created "an additional—and extremely powerful—weapon into the hands of the Union" and "altered the economic balance between labor and management[.]" *Id.* at 1198-99 (citation omitted).

Similarly, in *Bragdon*, a county passed an ordinance requiring employers to pay prevailing wages, which applied to public works projects, to employees working on private construction projects within the county. 64 F.3d at 498. The prevailing

14

wages for public works projects were determined by a state agency director based on a formula that averaged the wages and benefits for each craft pursuant to collective bargaining agreements within the locality in which the public works project was being performed. *Id*. at 502. Prevailing wage laws for public works projects are not preempted under the NLRA because the state acts as a proprietor and not a regulator. *Id*. at 501. The court distinguished the county ordinance from prevailing wage laws because the county was acting as a regulator by imposing the prevailing wage law for private construction projects. *Id*. at 501-02.

The court concluded that the county ordinance did not afford the same exemption from NLRA preemption as prevailing wage laws because it regulated private construction projects. *Id*. at 504. The court further determined that the county ordinance affected the bargaining process in a way that was incompatible with the general goals of the NLRA, in part, because the wage was developed and revised from the bargaining of others. *Id*. Specifically, the prevailing wages were derived from the combined collective bargaining of third parties and not from the employers and employees actually selecting construction projects in that locality. *Id*. at 502.

The holiday pay rule, in contrast, does not create a bargaining tool, let alone "an additional—and extremely powerful—weapon" for either the employer or their employees as in *Thunderbird* or affect the bargaining process like the county

15

ordinance in *Bragdon*. Again, the holiday pay provision simply sets a minimum level of pay for employees working on holidays while the date flexibility provision neither alters the minimum holiday pay nor encourages or discourages the collective bargaining process. Nursing home workers are paid the same minimum wage for the same number of holidays regardless of whether the employer proposes a modification to the holiday schedule. Because these provisions do not create a bargaining tool and do not alter the economic balance, they are distinguishable from the law preempted in *Thunderbird* and *Bragdon*.

> **2. The holiday pay rule does not micro-manage the nursing home industry.**

LeadingAge argues that the holiday pay rule improperly micromanages the employer-union negotiating relationship yet fails to cite any authority for that proposition. Instead, citing *520 South Michigan Avenue Associates v. Shannon*, 549 F.3d 1119 (7th Cir. 2008) and *Bragdon*, LeadingAge contends that the holiday pay rule is preempted under *Machinists* because it applies to only one occupation.

The holiday pay rule does not apply to one occupation, however. *See* Minn. Stat. § 181.211, subd. 9 ("'Nursing home worker' means any worker who provides services in a nursing home in Minnesota, including direct care staff, non-direct care staff, and contractors, but excluding administrative staff, medical directors, nursing directors, physicians, and individuals employed by a supplemental nursing services agency."). As explained by the Board in its December 10, 2024, memorandum,

nursing home workers include, but are not limited to, non-management registered nurses, certified nursing assistants, trained medication aids, dietary aides, and cooks. Minnesota Department of Labor and Industry, *Memo: How-To, Holiday Pay Rules*, (Dec. 10, 2024) [https://perma.cc/84HH-HHMX]; *see also* App. 232, R. Doc. 50 at 3, Add. 3. Indeed, at oral argument in district court, LeadingAge admitted that the holiday pay rule applies to multiple occupations. (App. 268, R. Doc. 50 at 39, Add. 39.)

In addition, the preemption finding in *Shannon* did not turn on the state law's occupational scope. 549 F.3d at 1139. Rather, the Seventh Circuit concluded that the law was not a true minimum labor standard—as evidenced by its formidable enforcement mechanism and unprecedented shifting of the burden of proof, and that it interfered with NLRA objectives by overriding dispute resolution mechanisms and interfering with the preexisting pay and quota structure. *Id*. And the Ninth Circuit has clarified that *Bragdon* does not prevent minimum labor standards just because they protect particular "trades, professions, or job classifications." *See Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004), *as amended*, No. 02-56735, 2004 WL 292128 (9th Cir. Feb. 17, 2004); *see also Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958 (9th Cir. 2016) (holding the city's minimum wage and time-off compensation ordinance applicable to hotel workers was not preempted). The Second Circuit has taken the same approach. *See*

*Rest. L. Ctr. v. City of New York*, 90 F.4th 101 (2d Cir. 2024) (holding the city law requiring just cause for termination of fast-food workers was not preempted).

### 3. A private right of action is an ordinary remedy for violations of a minimum labor standard.

Citing *Shannon*, LeadingAge argues that the private right of action available to nursing home workers for violations of the holiday pay rule infringes upon grievance and arbitration procedures found in unidentified collective bargaining agreements for resolving workplace disputes. (App. Br. at 56-57.) The private right of action was not the Seventh Circuit's overriding concern with the enforcement mechanism in *Shannon*; rather, it was the burden shifting provision of the law that prompted the Seventh Circuit's finding of preemption. *Shannon*, 549 F.3d at 1134 - 35. There, state law provided a rebuttable presumption of retaliation—if the employee alleged in good faith that the employer was not complying with the law and thereafter terminated or otherwise penalized the worker—that the employer's action was taken in retaliation. *Id.* The employer could only overcome the presumption by proving that the sole reason for the termination or penalty was a legitimate business reason. *Id.* In contrast, there is no burden shifting to the employer under Minnesota's enforcement mechanisms.

As the district court observed, the private rights of action available to nursing home workers are similar to those "available to workers to remedy nearly *every* type of wage dispute" in Minnesota. (App. 271, R. Doc. 50 at 42, Add. 42) (citing Minn.

Stat. § 177.27, subd. 8 ("An employee may bring a civil action seeking redress for a violation or violations of sections 177.21 to 177.44 and 181.165 directly to district court."))  The private right of action is also very similar to the enforcement mechanisms present in *Restaurant Law Center v. City of New York* for violations of a law that the Second Circuit concluded were not preempted under *Machinists*.  90 F.4th 101, 108 (2nd Cir. 2024) ("An employee who prevails at arbitration is entitled to attorneys' fees and costs, reinstatement or restoration of hours, and 'all other appropriate equitable relief,' including 'such other compensatory damages, or injunctive relief as  may be appropriate." (citation omitted)).  *See also* N.Y.C. Code § 20-1273(a).  Ultimately, the remedies available to nursing home workers for violations of the holiday pay rule are not unusual or different than the remedies available to other workers.  Accordingly, the holiday pay rule does not interfere with the objectives of the NLRA.

LeadingAge's reliance on *Chamber of Commerce v. Brown*, 554 U.S. 60 (2008), for the proposition that the holiday pay rule is a preempted because it does not allow the employer to opt out of the rule's enforcement scheme is also misplaced. In *Brown*, the Supreme Court addressed whether the state law violated Section 8(c) of the NLRA, which protects speech by both unions and employers so long as the communication does not contain threats of reprisal or force or promise of benefit. 554 U.S. at 67; *see also* 29 U.S.C. § 158(c).  In the current matter, LeadingAge has

not asserted that the holiday pay rule is preempted under Section 8(c) of the NLRA or that any part of the holiday pay rule has regulated their members' speech in violation of Section 8(c). Therefore, the Court's analysis relating to the law's enforcement scheme in *Brown* is not applicable here.

### 4. The holiday pay rule is not multi-employer bargaining.

Finally, LeadingAge suggests that the structure of the Board somehow equates to multi-employer bargaining in violation the NLRA. As identified by the district court, LeadingAge's concerns are misplaced. (App. 259-61, R. Doc. 50 at 30-32, Add. 30-32.) *Machinists* preemption is primarily concerned with establishing an equitable process for determining terms and conditions of employment; not the particular substantive terms of the bargain when parties are negotiating from relatively equal positions. *Metro. Life,* 471 U.S. at 753. It "is not a license for courts to close political routes to workplace protections simply because those protections may also be the subject of collective bargaining." *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 87 (2d Cir. 2015); *see also Rest. L. Ctr.*, 90 F.4th at 116 (*quoting Concerned Home Care Provider,* 783 F.3d at 87).

The holiday pay rule is significantly different than the regulations in *Thunderbird*, *Bragdon*, and *Shannon*, which were found to interfere with the bargaining process. Much like the regulations that have been upheld by the Supreme Court in *Metropolitan Life* and *Fort Halifax*; and by the Second and Ninth Circuit,

respectively, in *Restaurant Law Center* and *Concerned Home Care Providers*, and *Associated Builders & Contractors* and *Am. Hotel & Lodging*, the holiday pay rule applies to union and nonunion nursing home workers equally and does not encourage or discourage the collective bargaining process. Because the holiday pay rule is a true minimum labor standard that does not interfere with the collective bargaining process, LeadingAge's preemption claim under *Machinists* fails as a matter of law.

### B. The Date Flexibility Provision Is Not Preempted Under *Garmon* Because It Does Not Create A Labor Organization Or Direct Employers to Dominate Or Assist Labor Organizations.

*Garmon* preemption prevents states from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA and providing their own regulatory or judicial remedies for conduct prohibited, or even arguably prohibited, by the NLRA. *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986). Under *Garmon*, the NLRB has primary jurisdiction over claims that "arguably" constitute unfair labor practices under Sections 7 or 8 of the NLRA. 359 U.S. at 241–46. In essence, *Garmon* preemption prevents states from regulating activity that is arguably protected or prohibited by the NLRA. *Gould*, 475 U.S. at 286.

Contrary to LeadingAge's contentions, *Garmon* preemption does not apply to any regulation that touches on minimum labor standards. While the bar for asserting *Garmon* preemption may not be high, "[t]he precondition for pre-emption, that the

21

conduct be "arguably" protected or prohibited, is not without substance." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 394-95 (1986). As the Supreme Court made clear in *Davis*:

> If the word "arguably" is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board. The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.

*Id*. (citation omitted). While courts look primarily to NRLB decisions to determine whether *Garmon* preemption applies, when the NLRB has not addressed an activity, courts must assess the specific activity to determine whether it is "arguably" protected or prohibited under the NLRA. *Nat'l Ass'n of Manufacturers v. Perez*, 103 F. Supp. 3d 7, 22 (D.D.C. 2015).

The first step in establishing *Garmon* preemption is to identify which provision of Section 7 or Section 8 of the NLRA is alleged to protect or prohibit the state-regulated conduct. *Healthcare Ass'n of N.Y. State v. Pataki*, 471 F.3d 87, 96 (2d Cir. 2006). LeadingAge contends that the date flexibility provision violates Sections 7 and 8(a)(2) of the NLRA.[4]

---

[4] LeadingAge does not contend that the holiday pay provision is subject to *Garmon* preemption. (App. Br. at 22-42.)

**1. The date flexibility provision does not authorize employers to violate section 8(a)(2).**

Section 8(a)(2) prohibits employers from "dominat[ing] or interfere[ing] with the formation or administration of any labor organization or contribut[ing] financial or other support to it." 29 USC § 158(a)(2). The date flexibility provision does not instruct employers to take any such actions. Instead, it allows employers to take an up or down vote on whether to modify the date or time of the scheduled holiday.

**i. The date flexibility provision does not create a labor organization as defined under the NLRA.**

The NLRA defines a labor organization as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152. Here, the date flexibility provision does not create an organization of any kind. It simply provides a process for employers to modify the holiday schedule when the modification is supported by a majority of employees. No organization, agency, committee, or plan is formed. Rather, the date flexibility provision provides for a simple one-time up or down vote.

More fundamentally, the date flexibility provision somehow created an artificial organization, it does not create a labor organization as defined under the NLRA because the group does not exist for the purpose of "dealing with" employers.

23

While the Supreme Court in *N.L.R.B. v. Cabot Carbon Co.*, 360 U.S. 203 (1959), held that the term "dealing" should not be limited to only "bargaining with" under the NLRA, it is clear that the NLRB requires a pattern of negotiations with management for an interaction to amount to "dealing with" employers. *See Rest. L. Ctr. v. City of New York*, 360 F. Supp. 3d 192, 225-26 (S.D.N.Y. 2019).

> [The concept of "dealing"] involves only a bilateral mechanism between two parties. That "bilateral mechanism" ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.

*Id*. (quoting *E.I. du Pont de Nemours & Co.*, 311 NLRB 893, 894 (N.L.R.B. 1993)); *see also Vencare Ancillary Servs., Inc.*, 334 NLRB 965, 969-70 (N.L.R.B. 2001), *enforcement denied on other grounds by Vencare Ancillary Servs., Inc. v. N.L.R.B.*, 352 F.3d 318 (6th Cir. 2003) (same); *Vons Grocery Co.*, 320 NLRB 53, 54 (N.L.R.B. 1995) (same).

The date flexibility provision does not contemplate a pattern or practice of employee proposals to management. Indeed, the provision does not direct employees to make *any* proposals to management. Rather, the provision simply

allows workers to vote yes-or-no to a holiday schedule modification proposed by their employer.

Moreover, voting on whether to accept or reject an employer's proposed holiday schedule modification, as allowed in the date flexibility provision, is not a pattern or practice that rises to the level of "dealing with" employers. It is an isolated instance that may never occur at all. The NLRB has consistently found that isolated instances of a group making proposals to management that are either accepted or rejected do not constitute "dealing with" the employer under the NLRA. *See Vencare Ancillary Servs.*, 334 NLRB at 969-700 (finding an "isolated incident" in which five employees met in response to announced wage cuts, presented a memo to management on the issue, and began work stoppage did not amount to "dealing with" employer); *Vons Grocery*, 320 NLRB at 54 (finding a single incidence of an employee committee making proposals to management concerning conditions of work did not constitute a pattern or practice of dealing with the employer within the meaning of the NLRA); *E.I. du Pont*, 311 NLRB at 894 ("[I]f there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing."). Similarly, a vote that may occur to modify a nursing home's holiday schedule, as contemplated by the date flexibility provision, is an isolated

instance. All that is required by the provision for a change in the holiday schedule is a single up or down vote. There is no dealing required by the provision.

In fact, the date flexibility provision does not even require an employer to entertain modifying the holiday schedule. If the employer does not propose a modification to the holiday schedule, the employee approval provision is never triggered. If an employer does propose a modification, it only requires a one-time employee vote. As such, the employees are only voting on one isolated issue proposed by the employer, not engaging in a pattern or practice of making proposals to the employer that are either accepted or rejected by the employer. The date flexibility provision is silent on any possibility of negotiation between employers and employees on date changes. The conduct covered by the provision, which is the possibility of employees responding to a single poll, is not a pattern or practice that rises to the level of "dealing with" employers under the NLRA.

The NLRB decisions cited by LeadingAge are inapposite, as they pertain to employee committees that presented *employee*-initiated proposals to the employer and prompted extensive and ongoing negotiations. *See, e.g., Ona Corp.*, 285 NLRB 400, 405 (N.L.R.B. 1987) (finding that employee committee's policy proposals that were initially not accepted by management and required additional discussions between the committee and management rose to the level of "dealing with"); *St. Vincent's Hosp.*, 244 NLRB 84, 85-86 (N.L.R.B. 1979) (finding that a council made

up of employees and management discussing 25 different work-related topics at monthly meetings was "dealing with" the employer); *Ampex Corp.*, 168 NLRB 742, 746 (N.L.R.B. 1967) (finding that the purpose of the employee committee was "to present employee suggestions to the employer on subjects pertaining to conditions of work" and that the committee and employer "discussed matters traditionally raised at bargaining sessions between labor and management"). In contrast, the date flexibility provision is *employer*-initiated and contemplates no negotiation, just a single up-or-down vote.

LeadingAge also cites a Board memorandum—in which the Board responded to a frequently asked question about how an employer and nonunion employees should arrive at an agreement on modifying holiday schedules—to support their contention that the date flexibility provision requires employers to create a labor organization in violation of Section 8(a)(2). (App. Br. p 32, 34-35.) In its memorandum, the Board suggested that employers find a way to discuss a proposed holiday modification with nursing home workers and then make a decision together. Options suggested by the Board include "a meeting with a vote at the end, a survey monkey, a petition in the break room, or any other reasonable way for workers to let their voices be heard[5]." LeadingAge maintains that the possibility of a meeting

---

[5] Minnesota Department of Labor and Industry, *Memo: How-To, Holiday Pay Rules*, (Dec. 10, 2024) [https://perma.cc/84HH-HHMX].

between the employer and employees could result in bilateral discussions that create a labor organization. (App. Br. p 32, 34-35.)

First and foremost, the Board's memorandum is not part of the date flexibility provision, and the suggestions stated within the memorandum are not mandated by the Board or state law. *See Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1182 (8th Cir. 2019) (stating that agency enforcement guidance is not binding authority). As discussed above, the date flexibility provision itself does not create any organization, much less a labor organization, and LeadingAge cites no case law to support the proposition that asking employees to vote on a limited employment matter at maximum once a year transforms the employees into a labor organization.

Second, as also discussed above, voting on whether to accept or reject an employer's proposed holiday schedule modification, as provided by the date flexibility provision, is not a pattern or practice that rises to the level of "dealing with" employers as contemplated under the NLRA. It is an isolated event that only occurs if proposed by the employer[6].

---

[6] LeadingAge also argues that the date flexibility provision anticipates holiday schedule modifications on a yearly basis to support its contention that employee interaction rises to the level of "dealing with" employers. While an employer may propose modifications on a yearly basis, it need not do so; ostensibly, proposals will occur only if an employer changes its business model relating to holidays or the hourly parameters of a shift.

Because the date flexibility provision does not authorize or require the creation of a labor organization, LeadingAge's *Garmon* preemption claim under Section 8(a)(2) fails as a matter of law.

ii.    **The date flexibility provision does not direct employers to unlawfully dominate or assist a labor organization.**

Even if the date flexibility provision creates a labor organization (it does not), the provision nevertheless does not direct employers to dominate or interfere with the formation or administration of a labor organization. Rather, the date flexibility provision only requires employers to provide nursing home workers an opportunity to vote on the proposed holiday schedule modification. The employer's facilitation of a vote on a proposed modification does not rise to unlawful domination or interference under the NLRA.

Employer assistance or cooperation, like that incumbent in facilitating a vote on a proposed holiday schedule modification, does not establish unlawful domination or interference under the NLRA. An employer's assistance must *actually create control* over a labor organization to violate Section 8(a)(2). *N.L.R.B. v. Homemaker Shops, Inc.*, 724 F.2d 535, 545 (6th Cir. 1984) (emphasis added). "The test of whether there is unlawful domination or assistance by the employer is a subjective one, turning on whether the employees are in fact being deprived of their freedom of choice." *Id*. (citing *N.L.R.B. v. Keller Ladders Southern, Inc.,* 405 F.2d 663, 667 (5th Cir. 1968); *Federal-Mogul Corp. v. N.L.R.B.,* 394 F.2d 915, 918 (6th

Cir. 1968); *Coppus Engineering Corp. v. N.L.R.B.,* 240 F.2d 564, 571–73 (1st Cir. 1957); *Chicago Rawhide Manufacturing Co. v. N.L.R.B.,* 221 F.2d 165, 168 (7th Cir. 1955); *N.L.R.B. v. Sharples Chemicals, Inc.,* 209 F.2d 645, 652 (6th Cir. 1954)). In the current matter, it is clear that the date flexibility provision does not deprive employees of their freedom of choice. Rather, they are given the opportunity to express their choice on whether to modify a holiday schedule.

LeadingAge again cites the Board memorandum to support its contention that the date flexibility provision requires employers to dominate and assist the alleged labor organization in violation of Section 8(a)(2). (App. Br. 38-39.) As explained above, the Board's suggestions within the memorandum are not part of the date flexibility provision and are not mandated by the Board or state law. *See Brunckhorst*, 914 F.3d at 1182.

In addition, the Board's suggestions in no way require an employer to dominate or assist employees in deciding whether to agree to proposed holiday modifications. The date flexibility provision simply allows an employer to communicate a proposed schedule change, not dictate that change. As a practical matter, employees are unable to vote on a proposed holiday schedule modification unless they are first notified of the proposal. As referenced in the Board's memorandum, this can be done in various ways that do not dominate a labor organization. Thus, the only employer activity to scrutinize for domination or

interference is an employer's method of soliciting a response to the proposal from its employees.

Providing a method of responding to the employer's proposed holiday schedule modification does not amount to dominating or assisting in violation of Section 8(a)(2) of the NLRA. Several appeals courts have held that similar activities do not deprive employees of their freedom of choice, which is the touchstone of Section 8(a)(2). *See Homemaker Shops, Inc.*, 724 F.2d at 546 (finding that the company's reimbursement of work time lost and travel expenses incurred due to attendance at annual meetings with management was an example of a friendly and cooperative relationship); *Chi. Rawhide Mfg. Co. v. N.L.R.B.*, 221 F.2d 165, 170 (7th Cir. 1955) ("Allowing the use of Company property, and even time, for employee meetings is not in itself an unfair labor practice"); *Wayside Press v. N.L.R.B.*, 206 F.2d 862, 866 (9th Cir. 1953) (printing ballots along with paying employees during a meeting on company property and time did not constitute violations of the NLRA); *N.L.R.B. v. Brown Co.*, 160 F.2d 449, 454 (1st Cir. 1947) (finding that an unfair labor practice cannot be based upon a company permitting a labor organization to organize in its plant, on its time, and with the aid of its telephone and other facilities).

The date flexibility provision does not create a committee or group of employees to represent nursing home workers nor require employers to create a committee or group to determine whether to accept or reject the employer proposed

holiday schedule modification. It just offers the possibility of a vote. The legislative goals of the NLRA are to eliminate practices that obstruct the free flow of commerce and protect the rights of employees to organize and bargain collectively. 29 U.S.C § 151. Extending *Garmon* preemption to the circumstances here does not further the goals of the NLRA.

LeadingAge cites several NLRB decisions in which the employer's involvement in creating and determining the structure of an employee committee unlawfully assisted or dominated the committee in violation of Section 8(a)(2). The employer's actions in the cited NLRB decisions are starkly more intrusive, however, than those contemplated under the date flexibility provision.

For example, in *Keeler Brass Auto. Group*, the employer reformed an employee committee that it created eight years earlier. 317 NLRB 1110, 1115 (N.L.R.B. 1995). During the reformation, the employer unilaterally modified the grievance procedure to reduce the number of members on the committee and to control the meeting dates. *Id*. The employer further determined committee membership eligibility and length of terms, solicited employees to elect members, and controlled the election process. *Id*. That is not the case here. The date flexibility provision does not invite employers to manage or create any longstanding changes in an employee committee or negotiation group.

In *Duquesne Univ. of the Holy Ghost*, the NLRB concluded that the employer provided unlawful assistance to the employee committee by closely dealing with the committee through its personnel director; by providing advice and counsel to the committee; by assisting the committee in selecting a particular attorney to represent the committee in a related representation proceeding; by its staff relations committee functioning as part of an advisory body for the committee; and by its vice-president's attempting to act as an advisor to the committee. 198 NLRB 891, 891-92 (N.L.R.B. 1972). The NLRB found that the "less than an arm's length dealings" along with the employer's liberal availability of its facilities without costs was sufficient to interfere with the employees' freedom of choice as contemplated under Section 8(a)(2) of the NLRA. *Id*. Here, employers are not instructed to provide any guidance or instruction to their employees, rather, they are simply permitted to offer a choice and honor the majority opinion.

In a similar vein, in *Clapper's Mfg., Inc.*, the employer actually formed the employee committee, suggested the form and structure of the committee, unilaterally dictated the purpose of the committee, controlled the composition of the committee, and financially assisted the committee by providing it with a place to hold its meetings and paying the employees for performing committee functions. 186 NLRB 324, 334 (N.L.R.B. 1970), *enforced sub nom., N.L.R.B. v. Clapper's Mfg., Inc.*, 458 F.2d 414 (3d Cir. 1972). The NLRB affirmed the Trial Examiner's finding

33

that the employer's actions dominated the employee committee in violation of Section 8(a)(2) of the NLRA. *Id*.

Again, in *Han-Dee Spring & Mfg. Co., Inc.*, the employer established the grievance committee, determined the composition of the committee, presided over the meetings, provided a place to hold the meetings, and paid employees who attended the meetings. 132 NLRB 1542, 1551-52 (N.L.R.B. 1961). The Board concluded that the employer's conduct dominated the formation and administration of a grievance committee in violation of Section 8(a)(2) of the NLRA. *Id*.

In *Wahlgren Magnetics*, the employer initiated and sponsored an employee committee to meet with the employer monthly, during which they discussed grievances, rates of pay, wages, and other conditions of employment. 132 NLRB 1613, 1614, 1619 (N.L.R.B. 1961). The employer presided over the meetings, which were called by the employer and held in the employer's conference room, and paid employees while they attended. *Id*.

In each of the cases relied on by LeadingAge, the employers created and managed ongoing employee committees. The actions by the employers in those cases significantly contrast from the single employee vote contemplated by the date flexibility provision. The provision does not require the employer holding the vote to establish an ongoing committee or group, does not instruct the employer to manage the group, and does not suggest that the employer should be present for the

vote–only that they obtain the results. None of the NLRB decisions relied upon by LeadingAge to support their supposition that offering a single vote rises to the level of assisting or dominating an employee committee.

LeadingAge also relies on an inapposite advisory memorandum from the NLRB's Office of General Counsel in *Goody's Family Clothing*, 993 WL 726790 (N.L.R.B.G.C. Sept. 21, 1993). In *Goody's*, the NLRB's Office of General Counsel was asked to provide advice on whether an employer violated Section 8(a)(2) of the NLRA by reformulating and maintaining a safety committee in response to a new Tennessee law mandating the establishment of the safety committee. *Id*. at *1. Tennessee's state law required employers to form a safety committee composed of employer and employee representatives to address employee safety concerns and provided specific guidelines governing the operation of the committee, including its composition, when it must meet, the areas it must address, and how the employer must interact with it. *Id*. The law further required the committee to evaluate employee safety suggestions and make recommendations to the employer as well as a deadline for the employer to respond to the recommendations. *Id*. The employer revamped its safety committee to conform to Tennessee's law, provided space for the committee's meetings, and paid the committee members for time spent in meetings. *Id*. *4. More importantly, however, the employer determined which employees would serve on the committee and refused to agree to the Union's

demands for bargaining over procedures for selecting the employee members for the committee. *Id*. The Office of General Counsel concluded that the employer's actions created and dominated the safety committee in violation of Section 8(a)(2). *Id*.

Despite LeadingAge's claim to the contrary, the date flexibility provision does not create a committee or group of employees to represent the nursing home workers nor require employers to create a committee or group to determine whether to accept or reject the employer proposed holiday schedule modification. The date flexibility provision also does not require employees to make any proposals to the employer. It merely offers the possibility of a vote if the employer proposes a holiday modification. Further, the date flexibility provision does not task employers with scheduling meetings for their employees, developing agendas, or dictating the time and format for employees to vote on the employer's proposed modification to the holiday schedule. Significantly, employers do not select employees to represent the nursing home workers in determining whether to accept the proposed modification. Accordingly, LeadingAge's claim that the date flexibility provision violates Section 8(a)(2) of the NLRA under *Garmon* fails as a matter of law.

### 2. The date flexibility provision does not authorize any violation of Section 7.

Section 7 of the NLRA protects an employee's right to engage in collective bargaining as well as the right to refrain from engaging in such activity. 29

U.S.C. § 157. It is questionable whether LeadingAge may assert a claim under Section 7 on behalf of employees. Nevertheless, because the date flexibility provision does not create a labor organization and employees are not "dealing with" their employer as defined under the NLRA, the provision does not violate Section 7 of the NLRA.

LeadingAge argues that the date flexibility provision infringes upon nonunion employees' rights to refrain from collectively bargaining through representatives of their own choosing. (App. Br. 25-29.) The crux of LeadingAge's argument is that employees who vote in the minority on an employer's proposed holiday schedule modification should not be bound by the majority vote because they did not agree that those in the majority would represent their interests.

The district court correctly questioned whether LeadingAge, associations which consist of nursing home employers, may raise a preemption challenge under Section 7 because Section 7 confers rights on employees—not employers. Appeals courts are split on whether employers may assert NLRA rights of their employees. *Compare Viceroy Gold Corp. v. Aubry,* 75 F.3d 482, 489 (9th Cir. 1996) ("[Employer] does not have standing to assert the NLRA rights of its employees"); *Healthcare Ass'n of N.Y. State v. Pataki*, 471 F.3d 87, 96 (2d Cir. 2006) (refusing to consider Section 7 preemption argument because "[t]he associations have no valid claim that [state law] affects their rights under Section 7, since Section 7 only confers

rights on employees, not on employers"); *with St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (considering Section 7 preemption argument brought by employers and noting that "[w]e know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption").

Even if LeadingAge may assert a Section 7 preemption challenge, it fails as a matter of law for the same reason their Section 8(a)(2) preemption challenge fails. That is, the date flexibility provision does not create a labor organization, and employees are not "dealing with" their employer as defined under the NLRA. Accordingly, the date flexibility provision does not deprive employees of their right to refrain from collective bargaining activities.

LeadingAge's argument that the voting process intrudes upon Section 9(a) of the NLRA is also based on the erroneous premise that individual votes somehow create a labor organization.[7] *See* 29 U.S.C. § 152(4) (defining "representatives" as

---

[7] Furthermore, LeadingAge did not assert a Section 9(a) preemption claim or allege any facts in their Amended Complaint that employees voted on a proposed a holiday modification. On appeal, LeadingAge cites a declaration they submitted in support of their preliminary injunction motion, which is not before this Court on appeal. When considering a motion to dismiss for failure to state a claim, factual allegations are limited to those alleged in the complaint. *Midwest Disability Initiative*, 929 F.3d at 609 (8th Cir. 2019.)

any individual or labor organization).  Each nursing home worker has an individual vote in determining whether to accept or reject the employer's proposed holiday schedule modification and therefore, each worker represents themselves during the voting process.  Again, the date flexibility provision does not create a labor organization to collectively bargain for changes in the holiday schedule.

Because the date flexibility provision does not create a labor organization and employees are not "dealing with" their employer as defined under the NLRA, the date flexibility provision does not take away the nursing home workers' right to refrain collective bargaining activities.  Thus, LeadingAge's Section 7 preemption claim under *Garmon* fails as a matter of law.

### 3. LeadingAge's interpretation of "Arguably" is misplaced.

Finally, LeadingAge's contention that the date flexibility provision is preempted under *Garmon* is premised on an overly broad interpretation of *Garmon's* "arguably" standard.  (App. Br. 22-25.)  While the bar for asserting *Garmon* preemption may not be high, the "arguably" protected or prohibited standard is not without substance.  *Int'l Longshoremen's Ass'n, AFL-CIO*, 476 U.S. at 394-95; *see also Rhode Island Hosp. Ass'n v. City of Providence ex rel. Lombardi*, 667 F.3d 17, 38 (1st Cir. 2011) ("Even though the word "arguably" in the *Garmon* assessment is broad, it is 'not without substance,' 'is not satisfied by a conclusory assertion of pre-

emption,' and 'the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor.'" (citation omitted)).

As aptly stated by the district court, the "arguably" standard does not provide "a *carte blanche* invitation for a court to invent hypothetical and unrealized future violations by an employer and use those hypothetical violations to find an otherwise valid state law preempted." (App. 256, R. Doc. 50 at 27, Add. 27.) *See Rhode Island Hosp. Ass'n*, 667 F.3d at 39 (refusing to entertain a *Garmon* preemption claim based on a hypothetical situation not mandated by the terms of an ordinance); *cf. Idaho Bldg. & Const. Trades Council, AFL-CIO v. Inland Pac. Chapter of Associated Builders & Contractors, Inc.,* 801 F.3d 950, 965 (9th Cir. 2015) (finding a law that on its face banned job targeting programs, which courts have repeatedly held are actually protected under Section 7, was preempted under *Garmon*).

In this case, the activity required under the date flexibility provision is a vote to decide whether to accept an employer-proposed modification to the holiday schedule. On its face, the date flexibility provision does not require the creation of a labor organization, does not require employees to engage in dealing with employers, and does not prevent employees from refraining from engaging in collective bargaining activities. The provision simply recognizes that an employer may wish to change certain holiday dates and times based on the employer's business model and provides them with a method for doing so. As thoroughly

explained above, supra section II(B)(1), NLRB decisions have consistently found that more intrusive actions have not been violations of the NLRA.

LeadingAge contends that their interpretation of Sections 7 and 8(a)(2) of the NLRA is analogous to an advisory memorandum issued by the NLRB's Office of General Counsel in *Goody's Family Clothing*, 993 WL 726790 (N.L.R.B.G.C. Sept. 21, 1993), and therefore, supports their argument that the date flexibility provision "arguably" violates Section 7 and 8(a)(2). LeadingAge's reliance on *Goody* is misplaced. As has been explained above, supra section II(B)(1)(ii), the state law requirements in *Goody* were significantly different than the those in the date flexibility provision. Contrary to the state law in *Goody*, the date flexibility provision does not require employers to create a committee or group; does not require employees to make proposals to the employer; and does not task employers with scheduling meetings for their employees, developing agendas, or dictating the time and format for employees to vote on the employer's proposed modification to the holiday schedule.

LeadingAge also contends that the district court artificially raised the pleadings standard by refusing to entertain their hypothetical factual scenarios. To survive a motion to dismiss, however, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint itself must allege facts that

"state a claim to relief that is plausible on its face." *Id.* at 554. A complaint meets the facial plausibility standard when the alleged facts that let a court "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

LeadingAge has not pled any facts to suggest that a labor organization was created or that any of its members dominated or interfered with such organization resulting in a violation of the NLRA. LeadingAge points to the declarations filed in support of their motion for a preliminary injunction in an attempt to establish such facts; however, declarations are not considered when deciding a motion to dismiss a complaint as a matter of law. *Midwest Disability Initiative*, 929 F.3d at 609. Further, even considering the facts alleged, an employer offering their nursing home workers the chance to approve a change to the holiday schedule with a single vote does not constitute a violation of the NLRA.

LeadingAge's conclusory assertion of *Garmon* preemption based on hypothetical scenarios not alleged in their Amended Compliant is not sufficient to establish that the date flexibility provision "arguably" violates the NLRA. Accordingly, LeadingAge's *Garmon* preemption claims fail as a matter of law.

**CONCLUSION**

For all the reasons set forth above, the Commissioner respectfully requests that the Court affirm the district court's dismissal of LeadingAge's amended complaint.

Dated:  September 29, 2025

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


s/ Scott A. Grosskreutz
SCOTT A. GROSSKREUTZ
Assistant Attorney General
Atty. Reg. No. 0392714
(651) 757-1402 (Voice)
scott.grosskreutz@ag.state.mn.us

LINNEA VANPILSUM-BLOOM
Assistant Attorney General
Atty. Reg. No. 0403783
(651) 757-1212 (Voice)
linnea.vanpilsum-bloom@ag.state.mn.us

445 Minnesota Street, Suite 600
St. Paul, MN 55101-2131
(651) 297-4139 (Fax)

ATTORNEYS FOR APPELLEE

**CERTIFICATE OF COMPLIANCE**
**WITH FRAP 32**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

/s/ Scott A. Grosskreutz
Scott A. Grosskreutz
Assistant Attorney General

**CERTIFICATE OF COMPLIANCE**
**WITH 8th Cir. R. 28A(h)(2)**

The undersigned, on behalf of the party filing and serving this brief, certifies

that the brief has been scanned for viruses and that the brief is virus-free.

/s/ Scott A. Grosskreutz

# CERTIFICATE OF SERVICE

I certify that on September 29, 2025, I electronically submitted the Appellee's Brief to the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the NextGen CM/ECF system.

I further certify that all participants in the case are registered NextGen CM/ECF users and that service will be accomplished by the NextGen CM/ECF system.

Within five days of the notice that the Appellee's Brief have been accepted for filing with the Court, Plaintiffs-Appellants will be served via U.S. Mail the foregoing documents.

/s/ Scott A. Grosskreutz
Scott A. Grosskreutz
Assistant Attorney General